31 So.2d 107

## PAIR v. STATE.

### 6 Div. 236.

Court of Appeals of Alabama.

April 8, 1947.

Rehearing Denied April 22, 1947.

See also 32 Ala.App. 90, 22 So.2d 100.

Ben F. Ray, of Birmingham, for appellant.

Wm. N. McQueen, Atty. Gen., and John O. Harris, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The indictment in this case contained four counts. Each count, proper in form and substance, charged the defendant with the offense of murder in the first degree, in that he unlawfully, and with malice aforethought killed Clyde Casey, etc. (setting out in each count the manner and means of the killing).

The trial below resulted in the conviction of the defendant by a general verdict of the jury, as follows: "We the jury find the defendant guilty of manslaughter in the first degree as charged in the indictment and fix his punishment at imprisonment in the penitentiary for a term of five (5) years." Judgment of conviction was duly pronounced and entered in accordance with the verdict of the jury, from which this appeal was taken.

The verdict of the jury and the punishment fixed by them, were authorized under the provisions of Title 15, Section 323, Code of Alabama 1940.

The facts and circumstances leading up to the unfortunate difficulty which resulted in the death of Mr. Casey, are fully set out in the "Statement of Facts" contained in the briefs of respective counsel. The statement of facts in brief of counsel for appellant, is in substance as follows:

"The Defendant, Ralph F. Pair, and the deceased, Clyde Casey, bore the relationship to each other of attorney and client. Mr. Casey had been practicing law for several years in Birmingham, Alabama and for several months had been looking after a real estate deal in Shelby County for the Defendant who had paid him an attorney's fee for his services. A dispute arose, followed by an altercation in the lobby of the Woodward Building during which the Defendant struck the deceased with his fist, causing him to fall on a marble floor, resulting in injuries to his head proximately causing his death a few hours later.

"Ralph F. Pair took the stand in his own behalf and gave his version of the altercation. We will give his statement in brief. The facts show that Mr. Pair is an Electrician and had been working for different companies in Birmingham for several years. He formerly had lived in Shelby County and had been knowing Mr. Clyde Casey for a period of about ten years and had known Mr. Casey as a lawyer. He lawyer." He stated that Mr. Casey also spoke of Mr. Casey as being a "part time worked for Birmingham Electric Company as a "sub-station operator." Mr. Pair worked at night for Wallace Neon Display Company on 16th Street and Second Avenue, South. After working through the night, he got off work between 7:30 and 8:00 on the morning of February 20, 1945. He got in his car and looked after some personal matters and then went to breakfast at a grill on Third Avenue and 17th Street. After breakfast, he then went to the Woodward Building where the deceased had his office. He parked his car near the L & N Station. He then passed through the drug store and entered the lobby of the Woodward Building, caught the elevator and went to Mr. Casey's office, 418 Woodward Building. He stated that he had been to the office on many occasions. He stated that Mr. Casey had his name on the door and a desk in the office of the Doctors Bureau. When he reached

the office, Mr. Casey was not there. He stated that he knew the office hours of Mr. Casey, but when he found Mr. Casey was not in the office, he did not sit down and wait; that there was another man sitting in the office whom he had seen there before, but did not recall his name, whereupon Mr. Pair caught the elevator and went downstairs on his way home. He stated that when he got off the elevator on the ground floor, he did not see anyone; that he turned north towards a revolving door, whereupon he saw Mr. Casey coming through the double doors leading out of Lanes Drug Store into the lobby of the building; that Mr. Casey had on a tan suit and an overcoat and had an umbrella in his hand.

"He said, 'Good morning, Casey.' Mr. Casey replied, 'Good morning.'

"Q. And then was anything further said? A. I said, 'Do you know anything this morning?'

"Q. And what was his reply to that? A. He said, 'No I don't, Pair. I sure don't.'

"Q. And how close were you to him, standing? A. Well, we had approached right up to each other.

"Q. At that time, were you in any wise angry? A. Oh! No, sir.

"Q. And did he approach you in an angry mood? A. Well, no, sir.

\*   \*   \*   \*   \*   \*

"Q. Well, was there anything further said? A. Yes, sir.

"Q. What was that? A. He said, 'Well, I will try to see you in two or three weeks, and maybe I will know something then.'

\*   \*   \*   \*   \*   \*

"Q. All right, what did you say to him to that? A. I said, 'Well, I have just been up to your office and I work at night and I have got to go home and get some sleep,' and he said, 'Well, I have to get up to my office and I will see you in two or three weeks, and maybe I will know something then.'

"Q. Then what was done? A. I said, 'Casey, what the hell do you mean double-crossing me like this?' He said, 'By God, there ain't nobody double-crossing you on a damn thing.'

"Q. Then what was done? A. When he said that, he just sorta stepped back, made one step backward and got in that position.

"Q. Then what was done? A. I said, 'Casey, I am going to the Bar Association with this.'

"Q. And what did he say to that? A. He didn't say anything.

"Q. Well, did he do anything? A. Yes, sir. He rammed me with this umbrella.

\*   \*   \*   \*   \*   \*

"Q. Where did he ram you? A. In the left side.

"Q. How many times? A. Just one time.

"Q. What sort of an umbrella was it, a parasol, or an umbrella? A. Well, it was just a regular parasol.

"Q. A lady's parasol, or a man's parasol? A. Well, it was sorta like a man's parasol. It wasn't a lady's parasol, it was one of these black ones.

"Q. Well, when he rammed you, as you used the expression, with the parasol, what did you do? A. Well, I tried to knock the blow off.

\*   \*   \*   \*   \*   \*

"Q. Did you push it off? A. Yes, sir. It sorta hooked in my shirt and I pushed it down with my arm.

"Q. Which hand did you push the umbrella with? A. With my left hand.

"Q. What did you do with your right hand? A. I struck him on the face.

"Q. You struck him on the face? A. Yes, sir.

"Q. Was he facing you? A. Yes, sir.

"Q. How many times did you strike him? A. Just once.

"Q. And what did he do when you struck him? A. Well, after I struck him, he fell to the floor.

\*   \*   \*   \*   \*   \*

"Q. Now, what did you strike him with? A. With my fist.

"Q. Did you have anything in your hand? A. Nothing.

\* \* \* \* \* \*

"Q. All right, what did you do after you struck him? A. Well, I seen he looked like he appeared to be hurt after he hit the floor, and I stooped down to help him get up.

\* \* \* \* \* \*

"Q. Well, what did you do in trying to help him? You said you tried to help him? A. Yes, sir. I tried to help him sit up and I caught hold of his coat and pulled him up and asked him if he could sit up.

"Q. You caught him how? A. I just sorta caught hold of his coat. I asked him to sit up. I had one arm under his arm and one arm by his coat, and I asked him, 'Can't you sit up, Casey?'

"Q. Did he say anything? A. No, sir.

"Q. What did you do after you pulled him up? A. Well, I laid him back down and went in the drug store and asked for a doctor.

"Q. What did you say to him? A. I told him, I says 'There is a fellow out there in the hall that is hurt.' I says, 'Is there something you can do for him?' He says, 'Yes, I will see if I can help you after a while.'

"Q. And when you went back, what did you find? A. He was still laying there on the floor, and there was a young lady, and I think a man, and I stooped down and picked him up again and asked him could he sit up.

\* \* \* \* \* \*

"Q. Then what did you do? A. While I was trying to get him to sit up, this lady said, 'What's the matter with this man? Is he having convulsions?' I said, 'No, mam. He is hurt.'

\* \* \* \* \* \*

"Q. Then did you go out there? A. No, sir. I turned and went out the drug store.

\* \* \* \* \* \*

"Q. And went where? A. I went to my car.

\* \* \* \* \* \*

"Q. And when you got down to your car, where did you go? A. I went home.

"Q. About how far would you say it is, have you got any idea how far it is from the Woodward Building out to your house? A. It is probably 2½ or 3 miles. Just a guess.

\* \* \* \* \* \*

"Q. Now when you got home, what did you do? A. I told my wife about this difficulty.

\* \* \* \* \* \*

"Q. Then when you told her, what did you do? A. Why I called an officer, who is a Motorscout, but I called him.

\* \* \* \* \* \*

"Q. And when you called him did you report the altercation? A. Yes, sir.

\* \* \* \* \* \*

"Q. Did anybody call you, any officer? A. An officer called me about it a little after 11:00.

"Q. After you talked with this man, E. L. Ray, the Motorscout man, what did you do then? A. After talking a few minutes with my wife, I went to bed.

"Q. Did you work at night? A. Yes, sir.

"Q. And slept in the daytime? A. Yes, sir.

"Appellant then told about a telephone conversation with Detective Pierce who said he was over at the Jefferson Hospital. He related the conversation with Pierce, who said, 'Just go to bed and go to sleep, and if I need you, I will call for you.' "

We now incorporate the "Statement of Facts," as contained in brief of Attorney General:

"Testimony for the State in this case tended to show that on February 20, 1945, at approximately 9:15 o,clock, a. m., appellant accosted the deceased on the ground floor of the Woodward Building in the city of Birmingham. An argument arose over a matter that the deceased was handling for the appellant. Deceased was a part-time lawyer, working in the legal business in the mornings and operating a sub-station for the Birmingham Electric Company in the evenings. Appellant was seen hanging

around on the ground floor of the Woodward Building for fifteen or twenty minutes before the deceased walked in. There were no eye witnesses to the argument between appellant and deceased, nor to the beginning of the fight. State witnesses saw appellant strike deceased in the face three times and also saw him pick the deceased up waist high from the floor and throw him back on the marble floor of the building, and further saw him shove something in his back pocket that had the appearance of metal. One of the State witnesses exclaimed, 'Oh my God, you will kill him,' whereupon the appellant replied, 'He ought to die, the dirty son of bitch beat me out of four thousand dollars worth of real estate.' One of the witnesses for the State placed an umbrella under the deceased's head as he was lying on the marble floor, and appellant thereupon snatched the deceased from the floor and kicked the umbrella from under his head. Appellant then slammed deceased down on the marble floor twice more and walked out of the building. A registered pharmacist was summoned from the Lane Drug Company, which was a few steps from the elevators on the ground floor of the Woodward Building where the difficulty occurred.

"Several people had gathered around deceased as he lay there on the floor. The pharmacist took some cotton and wiped blood from deceased's mouth and said that he could not do anything for him. Deceased was removed to the drug store where an ambulance was called and he was carried to the Jefferson County Hospital. He died shortly after three o'clock that afternoon.

"A Mr. Pierce, a city detective, assigned to the Homicide Squad, was in his patrol car when he received a call to proceed to Jefferson County Hospital to make an investigation growing out of the fight between appellant and deceased. At the time he was instructed to go to the hospital he did not know anything about the fight, nor the names of the respective parties. He found deceased in the emergency room of the hospital on a table and observed the wounds on his person and his general condition. He later ascertained the name of the appellant and called him at his house on the telephone and asked him if he had been in a fight with the deceased to which appellant replied that he had. The detective then told him to come down to police headquarters the next morning around eight o'clock. However, deceased died a little after three o'clock and appellant was picked up on a murder charge the same afternoon of the difficulty.

"Appellant made a statement to Detective Pierce over the telephone as to the facts and circumstances leading up to the fight and later on, after appellant was charged with the homicide, he made another statement to Pierce, which statement was taken down in question and answer form and read over to appellant, but which statement appellant declined to sign. In the statement over the telephone appellant told Detective Pierce that he had some trouble with Mr. Casey at the Woodward Building that morning; that he left the building and went home and went to sleep; that he had employed Mr. Casey to handle a business transaction for him and that he had met Mr. Casey in the lobby of the Woodward Building and they had a few words, and that he, appellant, lost his temper and hit Mr. Casey. He further said that he had been upstairs in the Woodward Building to Mr. Casey's office and that he was not in and that he left the office and got on the elevator and reached the ground floor and went out into the lobby and saw Mr. Casey coming in from the Lane Drug Store, and that he asked Mr. Casey had he heard anything and Mr. Casey replied that he had not, but told appellant to come to his office one day the next week and he would talk to him. Appellant replied that he had to go home and that he had to find something out that day and he asked Mr. Casey, 'What do you mean by double crossing me on this deal?' Mr. Casey replied, 'By God, nobody has double crossed you on the deal, Mr. Pair.' The appellant then stated to Casey, 'I am going to the Bar Committee with this matter.' Deceased then turned to walk toward the elevator and appellant reached around him with his left hand and spun him around toward appellant and hit him one time.

"The next day while appellant was under arrest he made the further statement referred to in this brief in question and an-

swer form. In this statement appellant gave substantially the same story that he had given over the telephone, except to state that deceased gave appellant a hard jab with the umbrella when appellant grabbed him by the lapel of his coat and pulled him around and that appellant pushed him back under the chin and deceased fell to the floor and must have hit his head on the floor. He further stated that he had never had any trouble with Mr. Casey before this occasion, except one time when he went to his office and deceased was on the verge of cursing him out and told him to get the hell out of his office, that he was handling this deal. He further said that after he had knocked appellant down he tried to pick him up off the floor, and a lady stepped up and asked what the trouble was, and asked that someone get a doctor, and that he, appellant, went in the drug store and asked for a doctor. Appellant stated that he only hit deceased one time and that was with his fist; that he had no weapon of any kind.

"An autopsy was made by Dr. Roger Baker, a graduate of Harvard Medical School at Boston, but who was connected with the University. The autopsy showed the following:

"There was a large black eye, and swelling of those tissues in that region. The whole left cheek was swollen and it was thick where blood had run into the tissues Inside of the mouth there were cuts and a good deal of blood from those wounds. There were several brush wounds on the body. There was a fracture on the left side of the head five inches long that extended from the back of the left ear almost to the eye socket. The five-inch fracture was on the outside of the skull, but after the skull was entered it was found that the fracture extended even further on the inside and went to the roof of the eye socket. There was considerable blood in the region of the brain, that is, inside the cranial cavity, between the brain and the heavy covering of the brain. There was some injury to the brain substance itself, but no hemorrhage in the brain substance. There was considerable hemorrhage right inside of the eyeball on the left that ran along the nerve from the eyeball on the left toward the front.

"It was the opinion of the pathologist that the injury found on the body of deceased could not have been made with one lick and could not have been made with a man's fist. It was the opinion of the doctor that the wounds he found on the body of deceased brought about his death.

"The evidence for defendant tended to show that shortly after he left the fight, he called a motor scout in the city of Birmingham, who was a second cousin to his wife, and told him about the fight and asked him what to do. That the motor scout told him that he was going on duty about three o'clock and would look into the matter and see if there was anything on it at police headquarters.

"The pharmacist in the Lane Drug Company testified in behalf of appellant and stated that appellant came to the drug store and asked for a doctor, stating that someone was hurt and that he told appellant he would be out there in a few minutes and that he kept on filling his prescriptions and that in about five miutes, or less, appellant returned and told him that it was urgent that a doctor get out there. He further stated that appellant told him that the man out in the lobby was having some sort of fit.

"Some twenty-eight character witnesses took the stand in behalf of the appellant and each of them said that he enjoyed a good reputation and that he had a good reputation for peace and quietude.

"Appellant took the stand in his own behalf and gave his version of the difficulty, which was at variance with the statement he had given over the telephone to Detective Pierce and also with the statement which he gave that was taken down in question and answer form by the stenographer. He stated that he only hit the deceased one time, and that was with his fist; that he did not have a pair of knuckles, pliers, knife, or any other weapon. He denied that he told Mr. Pierce over the telephone that he lost his temper and for that reason struck the deceased."

From the foregoing statement of facts, both of which are sustained by the

record, it clearly appears direct conflict in the evidence is apparent, hence these questions were for the jury to consider and determine.

■ In this case the defendant relied upon self defense. It is the law that in order to invoke the doctrine of self defense, the accused must be free from all fault in bringing on the difficulty, that is to say, he must not have done anything, or said anything, to provoke the difficulty.

It will be noted hereinabove that the first belligerent word spoken which tended to bring on and provoke the unfortunate difficulty, was by the defendant wherein he admittedly stated, "Casey, what the hell do you mean double-crossing me like this" to which Casey replied, "By God, there ain't nobody double-crossed you on a damn thing." The difficulty followed immediately, it was therefore the province of the jury to determine that the defendant was not only not free from fault in provoking or bringing on the difficulty, but that he also fought willingly. As stated when this appears from the evidence the defendant cannot invoke self defense to justify his action in taking the life of his adversary.

■ Pending the trial in the court below numerous exceptions were reserved to the rulings of the court, and are here presented and insisted upon to effect a reversal of the judgment of conviction from which this appeal was taken. From our viewpoint, it would serve no useful purpose to discuss these insistences in detail. We have, however, examined and considered each of them, and our conclusion in this connection is, that no prejudicial error appears which would require or justify the reversal of said judgment. but however this may be, it affirmatively appears that under the evidence of the defendant himself, wherein it clearly appears the defendant was not free from fault in provoking the difficulty, and fought willingly, his plea of self defense, under the law was not available. Vaughan v. State, 21 Ala.App. 204, 206, 107 So. 797, certiorari denied 214 Ala. 384, 107 So. 799; Paul v. State, 21 Ala.App. 125, 105 So. 912.

■ In brief of able and earnest counsel of appellant, severe criticism of the evidence of State witnesses Mrs. Janie Vafes,

and John Coppock, both of whom were admittedly eye witnesses to the difficulty involved in this prosecution, and in effect we are urged to accord but slight, if any, credence, to their testimony. So far as the record discloses the two witnesses had no personal interest in the outcome of the trial, and nothing is apparent why they should have any reason to pervert their testimony. At any rate, however, all this was for the jury and not for this court, as the court has no authority in law to substitute itself for the jury.

■ In the concluding paragraph of appellant's brief it is insisted:

"From all the foregoing, we insist on behalf of the Appellant, that the trial in this case was not in accordance with the Constitution and the Laws of Alabama as construed by our Appellate Courts, and that this case ought to be reversed that a new trial may be had on manslaughter in the first degree, so that the question of murder might not be before the jury under any circumstances. The oral argument of the Solicitor is in keeping with a strong desire to hold this case up before the jury as murder in the first degree. We think Appellant ought to be granted a trial on manslaughter in the first degree in order that he may have a fair trial before a jury of his peers."

Replying to the above, it is only necessary to say, that it is apparent that this trial in the lower court proceeded throughout as the law provides, and this court is without authority to accord to this urgent insistence of appellant.

■■ Our case of Lanier v. State, 31 Ala.App. 242, 15 So.2d 278, 280, certiorari denied 244 Ala. 638, 15 So.2d 280, bears analogy to the case at bar. We there said:

" 'As a general rule, when a person enters into combat with another, intending no more serious injury than an ordinary battery, and no weapon is used, and death ensues, the person thus causing death, if his acts were wrongful or unlawful, and nothing more appears, would be guilty of no higher grade of homicide than manslaughter in the first degree.' * * *

"Generally, it is the law that every person intends to do what he does, and that the

natural, necessary and probable consequences of his acts were intended. In the instant case, as we see it, the trend of the evidence tended to show that the appellant entered into the fatal difficulty of his own volition."

No motion for a new trial was made.

No reversible error appearing in any of the court's rulings and the proceedings throughout being regular, it is ordered that the judgment of conviction from which this appeal was taken will stand affirmed.

Affirmed.